# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 24, 2010

## STATE OF TENNESSEE v. CHRISTOPHER LEE BARNETT

**Direct Appeal from the Circuit Court for Warren County**
**No. 11531     Larry B. Stanley, Judge**

---

**No. M2009-00756-CCA-R3-CD - May 20, 2010**

---

A Warren County jury convicted the Defendant, Christopher Lee Barnett, of attempted aggravated cruelty to animals. The trial court sentenced him to eleven months and twenty-nine days, ordering him to serve seventy-five days in jail and the balance of his sentence on probation. The Defendant appeals, contending the evidence was insufficient to support his conviction and that the trial court improperly sentenced him. After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, J.J., joined.

Robert S. Peters, Winchester, Tennessee, for the Appellant, Christopher Lee Barnett.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; John H. Bledsoe, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; Josh Crain, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the Defendant knocking his pet dog, Lucas, unconscious and filing down Lucas's teeth after Lucas chewed through several boards and wires belonging to the Defendant. A Warren County grand jury indicted the Defendant for aggravated cruelty to animals. At the Defendant's trial on this charge, the following evidence was presented: Joy Purcell, an employee of a dairy farm adjacent to the Defendant's residence, testified that

shortly after arriving at work at 5:00 p.m. on February 16, 2008, she saw the Defendant outside, crouched down about thirty yards from where she stood in her employer's milk barn. Purcell said it was still light outside and nothing obstructed her view of the Defendant. She recalled that the Defendant was on his knees, straddling his dog, a grayish-black Huskey with a fuzzy, thick tail, whom Purcell recognized as "Lucas," a dog she had seen on the Defendant's property in the past. She recalled that Lucas had always been "real playful, playing around the yard when we were there." She described what she then saw the Defendant do to Lucas:

> He was sitting there straddl[ing] the dog with his legs on each side of it holding the dog down and he had something in his hand and he was just raising it up and just beating the dog on the head just time after time after time.

According to Purcell, while the Defendant beat Lucas in the head "at least a dozen times," Lucas did not move, but his head "flinched" every time the Defendant hit it. Purcell could not identify the object the Defendant used to strike Lucas, but she described it as "long" and "straight."

Purcell next saw the Defendant take an instrument, place it inside Lucas's mouth, and move it back and forth. She said, "the dog's head was just going like this (indicating) every time he would do it. His head was just going back and forth with the force of it." After doing this for about a minute, the Defendant then took the instrument out of Lucas's mouth, and began to strike him again, striking him "several times" until he "just flopped over." Purcell did not see Lucas move at all after this.

Purcell said, after seeing this, she was "in shock" and afraid, and she was unsure whether the Defendant was perhaps drunk or "in a rage." She did not understand why the Defendant "would have done this to this animal." She summoned her daughters, who were nearby milking cows, and telephoned her boss, Vince Maxwell. She asked Maxwell to come to the milk barn because the dog was in danger, but then she told Maxwell she believed the dog was already dead.

The Defendant briefly remained on top of Lucas after Lucas stopped moving but then stood up and began kicking Lucas: "He got up off him and he kicked him several times and then he put his foot on top of him and stomped on him a couple times and the dog just la[y] there."

The owner of the dairy farm, "Mr. Paul," then pulled up to the farm, apparently after Maxwell called him and relayed Purcell's story. Purcell testified that no one besides herself, her daughters, and the Defendant was present before Mr. Paul arrived. Maxwell arrived

2

approximately fifteen minutes later. Fearing the Defendant, Purcell stayed inside the milk barn with her daughters throughout the entire ordeal but continued watching the Defendant in case he headed toward the milk barn to "bother" them. Purcell reiterated that she never saw Lucas move or get up after the Defendant began attacking him.

On cross-examination, Purcell agreed that it was beginning to get dark when she witnessed the Defendant beating Lucas. She testified that the windows in the "tank room" of the milk barn, where she stood watching the Defendant, were very clear because they had to keep the tank room "extremely clean."

Sarah Purcell, Joy Purcell's nineteen year old daughter, testified she was also working at Maxwell's dairy farm on February 16, 2008. She recalled that, around 5:00 p.m., she was in the parlor milking the cows, and her mother was in the tank room. Her mother called her and her sister, who also worked at the dairy, into the tank room. She entered the tank room, looked outside through the glass doors, and saw the Defendant standing in the yard across a driveway. Sarah testified that there was plenty of daylight at this time. She said that she saw Lucas lying motionless on the ground. Sarah then saw the Defendant stand over Lucas, look at him, kick Lucas "really hard" five times, and then stomp on his chest "really hard" two times. She recalled that Lucas remained limp and unmoving on the ground.

Sarah was familiar with the custom of nudging a deer with one's foot to check whether the deer is alive but said the Defendant was not doing this when he kicked Lucas. She reiterated that the Defendant forcefully kicked Lucas, "like he meant to hurt [him], like he was mad at [him]." Sarah's sister began crying while she watched the Defendant attack Lucas. Sarah wished to stop the Defendant but did not do so because she feared the Defendant was using drugs and might hurt her or her family. Instead, she joined her sister in the parlor and resumed milking. Sarah emerged once more and peered briefly outside where she saw the Defendant and several men standing and talking near Lucas.

Sarah insisted that, although the sky became darker earlier in February, when these events took place, she was certain of what she saw. Further, she said she was certain the Defendant was the man whom she saw strike Lucas.

On cross-examination, Sarah testified she believed that the force with which the Defendant kicked Lucas would have caused significant injury. She said she was unaware that Dr. Young did not find any injury to Lucas's torso or abdomen. Sarah did not know whether any lights were on outside when she saw the Defendant striking Lucas. She testified she believed thirty or thirty-five yards separated her and the Defendant. Sarah said she had talked about the Defendant's case with her mother and investigators, but she did not testify at the preliminary hearing.

The State then read the preliminary hearing testimony of Vincent Maxwell, who was unavailable for trial, into evidence. At the preliminary hearing, Maxwell testified he knew the Defendant only because he and the Defendant rented adjacent properties from Harry Paul. The Defendant rented a residence from Paul, whereas Maxwell rented a dairy farm from Paul.

On February 16, 2008, Joy Purcell called Maxwell, and, as a result of this call, Maxwell called Paul and drove to the dairy farm. When he arrived at the farm, he saw a dog lying unconscious on the ground with the Defendant standing nearby. Maxwell asked the Defendant whether the dog was alive, and the Defendant responded by picking the dog up to chest height by the skin on its neck and hips and saying "See, it's alive." When the Defendant did this, Maxwell saw "a lot of blood" pour from the dog's mouth. The Defendant then "tossed" the dog back to the ground.

The Defendant explained to Maxwell that he filed the dog's teeth because the dog had chewed up wires on his house and on a truck. Around this time, Paul told Maxwell that the situation was "none of his business," told him that the Defendant "was a professional at it," and told Maxwell to return to his dairy farm. Maxwell accordingly left, but as he did so he called the Sheriff's Department on his cell phone. The Sheriff's Department asked him to come to their station and give a statement, which he and the Purcells did after they finished the evening milking.

On cross-examination, Maxwell said he met the Defendant a few weeks before the incident in this case when the Defendant asked to borrow a bungee cord. Maxwell testified that, at this time, he perceived the Defendant to be a "real nice fellow." He testified that he previously never had any problems with the Defendant and that he had never seen him beat his dogs.

Maxwell testified that he saw an instrument that he could not identify lying near the dog when he arrived at the Defendant's house around 5:40 p.m. He said the instrument could have been a file or a rasp. He saw something blue lying on the end of the dog opposite this instrument. Maxwell said that, although he was not sure the dog was alive when the Defendant picked him up, he told the Sheriff's Department later that he believed the dog might still be alive. He recalled that the Defendant told him that he was a "professional at it" and that he had sedated the dog, though he did not go into detail about how he had done so.

Maxwell recalled that, after the Defendant explained why he had filed the dog's teeth, he told the Defendant that a "proper way [exists] to discipline any animal," to which the Defendant responded that "all animals need to be disciplined." Maxwell repeated that "a

4

proper way [exists] to discipline an animal" and that "if the dog was a problem [the Defendant] could have pinned it up or tied it or we would have helped him find a home for it." He explained that the Defendant was actually the first person to refer to what he did to the dog as "discipline."

Maxwell believed that the Defendant and another male whom Maxwell did not know moved the dog into the Defendant's garage because the dog was gone after he ended his call to the Sheriff's Department. Maxwell had not spoken with the Defendant since the incident.

Dr. Sam Young, a veterinarian, recalled that on February 19, 2008, the Humane Society brought Lucas, as well as another dog, to his office and requested he closely examine them for signs of abuse. Lucas appeared well fed and healthy. Upon closer examination, however, the veterinarian noticed that Lucas's eyes were very bloodshot and, when he opened Lucas's mouth, he realized most of his teeth were fractured or missing, and his gums were leaking blood. Upon closer examination, he discovered that the whites of both eyes were bruised and hemorrhaging appeared to have occurred beneath the sclera of each eye. The veterinarian explained that these injuries suggested Lucas had suffered severe trauma to the head.

In light of the severe trauma to Lucas's eyes and mouth, the veterinarian sedated Lucas in order to more closely examine him. He found that at least fourteen teeth on Lucas's lower jaw and sixteen teeth in the upper portion of his mouth appeared to have been filed down to their roots. Some of these teeth were worn off smoothly all the way down into the root canal, but a number had fractured and shattered down below the gum level.

The doctor x-rayed Lucas's torso to search for broken ribs. Reviewing these x-rays, the doctor noticed that Lucas's stomach contained a dense material such as metal or bone. This piqued the doctor's interest because, given the state of the dog's teeth, he could not have eaten any hard, bony substance. The objects in Lucas's stomach appeared to be the crowns of his own teeth, which he had apparently swallowed.

Assessing the viable treatment options for Lucas, the veterinarian suspected that full restoration of his teeth would be a near impossibility given that his teeth were not merely chipped but filed down to the root. He contacted veterinarian dentists, and they confirmed this assessment. As a result, the veterinarian performed two surgeries on Lucas, which restored Lucas's mouth to a "functioning" level. These surgeries included thirteen root canals and six total removals of teeth.

The doctor testified he had never seen a dog's mouth in a state similar to that in which he found Lucas's mouth. He said no veterinary practice existed in the United States that

5

would leave a dog's mouth in such a state. Dr. Young explained Lucas's teeth had been filed well past their roots, which contain a nerve and typically extend anywhere from a third of the way up to nearly the tip of a tooth, and almost to the gum line. He explained that, whereas a healthy dog's incisors and canine teeth are much higher than his molars, all of Lucas's teeth except for his back molars, which his cheeks covered, had been filed level.

Dr. Young testified that the instrument used to file Lucas's teeth could not have been a traditional dental instrument for dogs. Similarly, he said a "machinist file," a file used to sharpen farm equipment such as a lawnmower blade, could not have been used to file Lucas's teeth. The doctor explained that a machinist file would have left a smooth edge, whereas Lucas's teeth were shattered where they were flattened.

The doctor said the only instrument he could imagine was used was a dental float, which is used to file sharp points on a horse's teeth or rasps on a horse's hoof. Dr. Young had never heard of its use on any other animal. He explained that, as a horse ages, its teeth can develop a sharp edge that can cut its cheek and tongue. In order to correct this, a dental float is used to file away the enamel that has caused this sharp edge. Dr. Young testified that this process is painless because the dental float is used only to file away the enamel but that, if one were to file deeper, into the root, this would be painful. He testified that he does not typically sedate a horse in order to file its teeth but that he might have to sedate a horse that was a "bad actor."

Dr. Young explained using a dental float to file away a dog's teeth without sedating the dog would be physically impossible for the doctor. He explained that, without sedation, a dog would not remain still, would experience a great deal of pain, and probably would bite the person performing the filing. He said he would use prescription drugs in order to sedate the dog. The doctor said that only a veterinarian would have access to the sort of drug necessary to sedate a dog. Dr. Young testified that in order to perform a root canal on a dog, he would have to place the dog under deeper anesthesia than that which would be necessary to perform open chest surgery. He explained that the stimulus of pain and the resulting movement required the deeper anesthesia. The doctor testified that it is standard practice to administer post-operative pain medication to a dog after performing a root canal.

Dr. Young testified that he agreed to file a dog's teeth only once, when an elderly couple asked him to file their dog's canine teeth because the dog was set to be put to sleep for "nipping" people. The veterinarian filed down the dog's canine teeth and filled the root canals. He recalled that several coon hunters had asked him to cut their dogs' canine teeth off because the dogs bite trees. The doctor testified that he always refused to do this.

The doctor testified that no veterinary practice existed that would warrant the "sort

6

of activity" that had apparently occurred. He testified that if a licensed veterinarian had performed this crude surgery on an animal and left it in the condition in which he found Lucas, the veterinarian would "run a good risk" of losing his veterinary license. Dr. Young said that, although a dog probably has a higher pain threshold than a human, the damage to Lucas's mouth almost certainly subjected Lucas to severe pain.

On cross-examination, Dr. Young said that animal owners sometimes perform procedures on their animals that a veterinarian normally would perform. The doctor did not know whether other veterinarians had agreed to file down a coon dog's teeth. In fact, he was not aware of any veterinarian ever filing down a dog's teeth for any reason. He testified that, although he does not declaw cats, his partner does. Dr. Young said he does, however, occasionally perform a dental float procedure on a horse. He agreed that, in the past, animal owners have performed many procedures on their animals that he would not be willing to perform.

Although he could not pinpoint the exact date on which Lucas's zygomatic arch was fractured, the doctor said it must have been fractured within two weeks of when he saw Lucas, three days after the incident in this case occurred. He agreed that he did not know what exactly was inside Lucas's stomach, but he said it could not have been wire.

Harry Paul, a retired dairy farmer, testified that he leases a house to the Defendant, whom he described as a good renter. Paul said that he had been very familiar with the Defendant's dogs, as he had seen them when he visited the property every morning to feed his calves. He said they were very friendly dogs, who ran out every morning to meet him. Paul said the Defendant "loved" his dogs and petted them, treating them "like they were babies." Paul was acquainted with Vincent Maxwell, the owner of the dairy farm next to the property he leased to the Defendant, and the ladies that milk Maxwell's cows.

Paul recalled that on February 16th sometime after 5:00 p.m. Maxwell called him and reported that he had just spoken with Purcell, who told him the Defendant had just beaten his dog unconscious with a pipe wrench. Maxwell said he was afraid he would "get into it" with the Defendant if he himself went to speak with the Defendant, so he asked Paul to go check on the situation instead.

Paul testified that, when he arrived, it was already dark outside. He saw the Defendant standing in the yard, and he went over and talked to him. Paul testified he saw Lucas, whom he described as "asleep," and he said that "there wasn't a mark on the dog." Paul believed Lucas had been "put under anesthesia."

Paul recalled that Maxwell arrived a few minutes later and asked the Defendant

7

whether Lucas was dead. According to Paul, the Defendant responded, "He's not dead," and picked up Lucas "by his skin" and set him on his feet. Paul said Lucas remained on his feet for five to ten seconds, though he was in a daze, but he "went on to the ground because he was still under sedation." Paul said he never saw the Defendant drop or kick Lucas.

Paul asked the Defendant why Lucas was sedated, and the Defendant told him he had put Lucas to sleep and filed his teeth off because Lucas had chewed wires under his truck, the "pigtail" on his truck, the liner bed on his truck, and satellite wires under his house. Paul testified he knew the dog had been chewing things on the property and digging holes in the ground, and he himself had tried to cover the vents under the house, but Lucas chewed up or moved every cover he used to cover the vents.

Paul testified he had never seen the Defendant beat, hit, or kick Lucas. He also said that Lucas had never exhibited any fear of either himself or the Defendant. Paul testified that, when he went to his barn the next day to feed his calves, Lucas ran out with the Defendant's other dog and met him as they always had before. He said neither was whimpering or otherwise appeared to be in pain. Paul said nothing about the Defendant's past or present behavior changed his opinion of the Defendant.

On cross-examination, Paul said he began leasing his house to the Defendant on January 1, 2008, which was thirty-six days before this incident. He explained that he had known the Defendant before he moved into his property because the Defendant previously lived down the street. Paul recalled that he used to see the Defendant's dogs when he lived down the road and that, at that time, he kept them collared and contained in the yard. He acknowledged that, although he saw the dogs daily, the Defendant could have beaten them when he was not around the property.

Paul testified that it was dusk, not entirely dark, when Maxwell called him around 5:45 p.m. He said the front of the garage on the property the Defendant rented had a light that came on at night. Paul went into more detail about the scene he found when he arrived to check on Lucas. He said, when he arrived, the Defendant was standing in front of the garage, and Lucas was lying motionless on the ground. Paul said that Lucas was not bleeding and that he did not see any device, including any instrumentality of anesthesia, lying near Lucas. He explained that he believed the Defendant had sedated Lucas because the Defendant told him he had done so. Paul agreed that it was not appropriate to sedate a dog by beating it over the head and that, had the Defendant done so, he would not believe the Defendant was "a person that is good to his dogs."

Paul recalled that, when Maxwell arrived , Maxwell was "kind of hyper" and "kind of hollered" at the Defendant when he asked the Defendant whether Lucas was dead. Paul

said blood did not pour from Lucas's mouth when the Defendant picked him up, and he could not tell whether Lucas's mouth was bleeding because "his mouth was closed." He recalled that, before Maxwell arrived, the Defendant told him he had sedated Lucas and filed his teeth because he had "chewed up so much stuff."

Paul denied that he said anything to Maxwell once he arrived, specifically denying that he told Maxwell that whether Lucas was dead was "none of his business." He did not know whether the Defendant told Maxwell that his treatment of Lucas was "none of his business." Paul believed that the Defendant told Maxwell that he had sedated Lucas and filed his teeth because he had chewed his property. Paul said he stayed until Maxwell left. Paul testified that, several days after this incident, after learning Maxwell reported the Defendant, Paul may have told Maxwell that what the Defendant did with Lucas was his own business.

Paul testified he believed that Maxwell should not have come to the house he leased to the Defendant and that reporting the Defendant was unnecessary. He acknowledged that he and Maxwell had previously disagreed about items they borrowed from one another.

On redirect examination, Paul estimated that 260 feet separated the milk barn from where the Defendant stood with Lucas near his garage.

Dr. Philip Gordon, a licensed veterinarian with the Tennessee Department of Agriculture, testified that the Defendant worked with him part time from 1990 to 1992. He testified that, during this time, he never observed the Defendant abuse an animal and that he "talked to them, interacted with them, walked them, [was] hands on." He testified that the Defendant would have observed many procedures he performed, including the use of a float blade to file a horse's molars. Although the doctor could not specifically recall the Defendant observing him file a horse's teeth, he testified the Defendant likely saw him perform this routine procedure. Regardless of whether the Defendant observed such a procedure, Dr. Gordon said the Defendant would never have participated or aided him in performing the procedure.

Dr. Gordon testified that he would not use a dental float on many animals but that he used one to file a coon dog's teeth three or four times. The doctor said that veterinary standards evolve and that some widely accepted procedures in the past now are out of favor. He testified he had never seen the Defendant do anything that was deliberately cruel to any animal.

On cross-examination, Dr. Gordon testified that, when he has filed coon dogs' teeth, he used the fine side of the dental float that he uses to file a horse's teeth. He explained that

filing a dog's teeth with a dental float is not common because doing so neither prevents a dog from chewing on a tree or fighting other dogs; it merely makes the damage from doing so less severe. The doctor said that, on the occasions on which he has filed a dog's teeth, he has filed only minimally, only enough to remove the sharp edges, never filing enough to strike a nerve. He also said he used a drug called sodium Pentothal to anesthetize each coon dog whose teeth he filed. Dr. Gordon testified that filing a dog's teeth without deep sedation likely would be impossible due to the pain filing causes.

The doctor explained that sodium Pentothal, a general anesthesia with a short-acting barbituate, is no longer on the market. Dr. Gordon testified that neither sodium Pentothal nor any other anesthesia necessary to sedate a dog is available on the open market to a lay person and only a veterinarian would have access to these sedatives. He said, however, that a farrier, the Defendant's job title when he worked for Dr. Gordon, would have access to Rompun and Acepromazine, pre-anesthetic drugs with only short-term sedative potential. Rompun and Acepromazine are used on both horses and dogs, and are commonly administered to calm a boisterous horse in order for a veterinarian to perform minor procedures on a horse's mouth or feet. He clarified that only a licensed veterinarian could legally administer these drugs.

Dr. Gordon agreed that no legitimate purpose for filing a dog's teeth exists. He testified that, although he did not recall allowing the Defendant to file a horse's or a dog's teeth, allowing a licensed veterinary technician to file a horse's teeth under supervision would be within veterinary regulations. The doctor said that, when he has treated a dog's fractured teeth in the past, the dog displayed pain and discomfort for only twelve to twenty-four hours after treatment.

On redirect examination, Dr. Gordon explained that a farrier shoes and trims a horse's feet. He said farriers do not have access to sedatives but, in his estimation, would need sedatives given the difficulty of working on a horse's feet. Also, he said sedatives would be useful in filing a horse's teeth because a horse is prone to bite when his teeth are being filed.

The Defendant, who was thirty-six at the time of trial, testified that he held a bachelor's degree in animal science and a master's degree in animal physiology and that he had completed two and a half years toward a doctorate in animal physiology. He explained that animal physiology is the study of the systemic physiology of cows and horses and that his doctoral focus is on reproduction. He recalled that he worked at an animal clinic off and on for nine years and continuously for six years, for a total of fifteen years. He said that, during this time, he prepped dogs for surgery, floated teeth, bred mares, dehorned calves, and "anything and everything that floated through that clinic." As to his interaction with dogs specifically, the Defendant bathed them, prepped them for surgery, walked them, and cleaned

10

their kennels, among other things. As an adult, the Defendant owned three dogs and two cats. The Defendant said that, during the time he worked with Dr. Gordon, he saw dental floats used on a horse countless times and on a dog at least three times.

The Defendant testified he was a certified farrier, meaning he passed several written and hands-on exams demonstrating his ability to trim and shoe a horse's foot. The Defendant explained that he did not need to sedate every horse to shoe it but that some horses protest so much that he had to sedate them. He cited the example of a particularly violent horse who was so notorious for being defensive that her veterinarian prescribed Rompun and Acepromazine to the horse's owner to give to the Defendant for use when he shoed her. He explained that this is how he acquired Rompun, which he testified he used to sedate Lucas. He said he administered one "cc" of Rompun to Lucas, and five minutes later Lucas "just went over and laid down and was out."

He testified that he had never beaten or hit either of his dogs but that he "scolded" Lucas once with a magazine when Lucas fought with Honey, his boxer, over food. He confirmed that he moved from a house down the street into his current residence, where the incident in this case happened. He said Lucas began demonstrating problem chewing behavior when he lived down the street. He recalled that Lucas chewed all the front and back wires from under his 1985 model truck and that he later chewed all the front and back wires from under his 1998 Dodge truck. Lucas also chewed the under-pinning of a trailer as well as duct work. During the summer of 2006, a particularly hot summer, Lucas chewed the wires of his central air conditioning unit, which incapacitated the unit. He recalled that, because his air conditioning did not work after this, he had to travel to Manchester, Tennessee, and rent a hotel room in order to sleep in comfort.

The Defendant said that, although some people may have euthanized a dog who behaved like Lucas, he was sentimentally attached to Lucas due to Lucas's similarity to a dog the Defendant had as a child. He explained that, rather than "get rid of" Lucas, he tried several times to "cure this dog of this destructive habit." First, he collared Lucas to a long lead attached to a corkscrew stake driven into the ground in order to limit the perimeter in which Lucas could travel. He abandoned this approach because he felt guilty confining Lucas and because Lucas was chewing on the lead itself. Next, he purchased a radio fence system to keep him in his yard, and he parked his trucks outside the fence line. Lucas, however, began chewing under his house, so the Defendant consulted a trainer at a Manchester animal clinic, who told him to get another dog because Lucas's chewing was due to boredom or loneliness.

Acting on the trainer's advice, the Defendant acquired his boxer, Honey. After Honey arrived, Lucas's behavior slightly improved, but he eventually resumed chewing, so he

returned to the trainer, telling her he was "at his wit's end." At the trainer's suggestion, the Defendant filled dog toys with Cheez Whiz, froze the toys, and gave them to Lucas, hoping this would occupy him. This did not work, and neither did several rawhide bones he bought Lucas. He said Lucas would simply bury the bones and return to chewing things on the property. He also gave Lucas cow bones, which he would destroy in a day. The Defendant said this chewing behavior lasted ten and a half months, nine months of which he spent actively seeking to curb the behavior.

The Defendant said that one day he came home and found that Lucas had chewed the pigtail off of a trailer he had rented and that he had chewed all the wires off of a commercial lawnmower, belonging to a business associate, that the Defendant was storing in his garage. He testified that he had to pay for the damage to the rented trailer and that the lawnmower was worth $10,000. The Defendant recalled that, at this point, he decided to file Lucas's teeth. He described his thought process: "[I said to myself, T]here is a ten thousand dollar lawnmower he's chewed all the wires off of. I can't keep this up and I remembered we had done this procedure and instead of killing the dog, I gave him the shot and put him out and did the dental procedure."

The Defendant testified that, because he did not intend to inflict any harm or pain upon Lucas, he put him to sleep before he filed his teeth. He testified the only reason he filed Lucas's teeth was to keep him from chewing wires under his house and destroying his property. He emphasized that people warned him that the exposed, torn wires were a fire hazard. He said he liked Lucas, that he still likes Lucas, and that Lucas had never exhibited any fear toward him. The Defendant emphasized that the morning after he filed Lucas's teeth, Lucas acted normally toward him and ate dry dog food, as was his custom.

On cross examination, the Defendant testified that when he came home on February 16, 2008, and found the damage Lucas had caused to the trailer and lawnmower, he had "had enough." In the Defendant's mind, he had only two options: kill Lucas or file his teeth down. He acknowledged that he could have given Lucas away rather than kill him or file his teeth, but he said the person to whom he gave Lucas might expect him to pay for any damage Lucas caused.

The Defendant said that, contrary to Purcell's testimony, he never struck Lucas in the head. He acknowledged that, because he had never met Purcell before the day in question, she had no reason to lie about him. The Defendant also denied kicking Lucas, as Purcell's daughter said he had done. He said that, at the most, he nudged Lucas with his foot to see whether he was awake yet. He agreed that the veterinarians were probably correct when they testified that filing a dog's teeth past the enamel and down to the gum line is an abnormal practice. He said, "I filed them and if I went too far, so be it. I didn't mean to do it too far.

12

I'm not a professional. I just did a procedure that I had seen done and tried to emulate a procedure that I had seen done."

The Defendant testified that he did not know whether Lucas experienced pain when he filed Lucas's teeth, but he emphasized that Lucas was able to eat dry food the next day. He said he gave Lucas 150 milligrams of clindamycin, an antibiotic, on Sunday morning, Sunday evening, and again on Monday morning. He explained that he received this antibiotic previously for a dog whose leg was injured. Recalling from his days in the animal clinic that clindamycin was the antibiotic "of choice," he gave it to Lucas after filing his teeth. The Defendant testified that, in his view, he did nothing wrong because he merely performed a surgery veterinarians perform, though he did so to a greater "extent."

On redirect examination, the Defendant testified that, in sedating Lucas and later giving him antibiotics, he performed the filing procedure just as a veterinarian would do. He said he filed Lucas's teeth "in order to avert [or] end a problem," which he identified as the "chewing of all [his] property, the wires, [his] vehicles, you know, everything that he was chewing." The Defendant testified that he did not file Lucas's teeth in order to harm Lucas.

Dr. Young again testified, in rebuttal to the Defendant's evidence, explaining that the anesthetic Rompun is a trade name for xylazine, which is a sedative and analgesic approved for use with horse and deer. He testified that, though Rompun is sometimes used as a pre-anesthetic to prepare a dog to receive anesthesia, it never is used by itself as an anesthetic. He explained that Rompun cannot be used to anesthetize an animal because the level necessary to cause anesthesia is highly lethal. He agreed that, in order to sedate a dog, such as Lucas, using Rompun, one would have to use "right at a lethal dose, maybe past it." He said if, rather than completely sedating Lucas, the Defendant gave Lucas only one "cc" of Rompun, Lucas would be immobile but would probably thrash around when the Defendant filed his teeth. He explained that Lucas would thrash not because he was experiencing pain but because he would be awake and aware of what was going on. Dr. Young testified that Acepromazine is "strictly a tranquilizer," explaining that it only immobilizes an animal rather than relieving any pain or causing sedation.

The doctor testified that both Rompun and Acepromazine are prescription drugs, which "have to come through a licensed veterinarian." He testified that he cannot legally prescribe or distribute these drugs to a lay person and allow the lay person to administer them. He testified that clindamycin, an antibiotic, is a prescription drug that a lay person could obtain from a veterinarian and give to an animal.

Dr. Young testified that, out of caution, his clinic fed Lucas only canned dog food. He did not know whether Lucas would have been able to chew dry food. Finally, the doctor

13

testified that the Defendant could not have filed Lucas's teeth using only Rompun and Acepromazine, emphasizing again that the level of Rompun necessary to sedate Lucas would have been lethal.

Based upon this evidence, the jury convicted the Defendant of attempted aggravated cruelty to animals.

At the Defendant's sentencing hearing, a representative from the Warren County Humane Society, Andi Anderson, testified about the physical trauma Lucas sustained as a result of the Defendant's conduct. She testified that Lucas was brought to her at the Humane Society with seven fractured teeth and thirteen bleeding pulp wounds. She said that for the two weeks leading to the restorative surgery Dr. Young performed, Lucas could only eat specially prepared meals, and he consistently required pain medication. Lucas continued to require specially prepared meals for several weeks after his surgery until his mouth was well. She said that Lucas also suffered from head trauma, which the bleeding in the whites of his eyes made evident. Anderson appealed to the trial court to "come forward with a good resolution," saying that "if there was ever a case where something was done terrible to an animal this would have to be it."

At the conclusion of the hearing, the court sentenced the Defendant to eleven months and twenty-nine days at 75%, with seventy-five days to be served in the Warren County jail and the remainder on probation. It is from this judgment that the Defendant now appeals.

## II. Argument

On appeal, the Defendant contends the evidence is insufficient to support his conviction and that the trial court erred in sentencing him.

### A. Sufficiency of the Evidence

The Defendant contends the evidence is insufficient to support his conviction for attempted cruelty to animals. He argues that, while his actions may have been "misguided" and "outside what veterinarians would claim reasonable," the record does not establish that he acted in a "depraved and sadistic" manner as a conviction for attempted aggravated animal cruelty requires.

The State responds that both the manner in which the Defendant filed Lucas's teeth and the resulting damage support the jury's finding that the Defendant attempted to commit aggravated animal cruelty against Lucas. Further, the State contends that the record would also support a conviction for the indicted offense of aggravated cruelty to animals and, as

14

such, sufficiently supports the lesser-included offense of attempted aggravated cruelty to animals.  The State also notes that the record does not support any statutory exclusion to animal cruelty.

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956).  "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859.  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (Tenn. 1963)).  This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith,* 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).  Further, we note that when the evidence is sufficient to support a conviction for the greater offense charged, a defendant "cannot complain of the jury finding him guilty of the lesser offense."  *McDonald v. State*, 512 S.W. 636, 649 (Tenn. Crim. App. 1974); *see State v. Carrie Ann Brewster and William Justin Brewster*, No. E2004-00533-CCA-R3-CD, 2005 WL 762604, *1 (Tenn. Crim. App., at Knoxville, Jan. 25, 2005), *perm. app. denied* (Tenn. Aug. 22, 2005).

A person commits aggravated cruelty to animals when, with aggravated cruelty and with no justifiable purpose, he intentionally kills or intentionally causes serious physical

15

injury to a "companion animal," which includes dogs.  T.C.A. § 39-14-212(a) and (b)(2) (2006).  Also, the Code defines "aggravated cruelty" as "conduct which is done or carried out in a depraved and sadistic manner and which tortures and maims an animal . . . ."  T.C.A. § 39-14-212(b)(1).  Because the statute does not define either "depraved" or "sadistic," we consider the ordinary meaning of these words in evaluating the sufficiency of the evidence.  Merriam-Webster's Dictionary defines *depraved* as "marked by corruption or evil; especially: perverted."  *Merriam-Webster Online Dictionary*. 2010. Merriam-Webster Online. 8 April 2010 <http://www.meriam-webster.com/dictionary/depraved>.  It provides two definitions of *sadistic*: (1) "a sexual perversion in which gratification is obtained by the infliction of physical or mental pain on others (as in a love object)"; and (2) a "delight in cruelty" or "excessive cruelty."  *Id*. <http://www.meriam-webster.com/dictionary/sadistic>.

A person commits criminal attempt where, acting with the kind of culpabiltity otherwise required for the principle offense, the person "acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ."  T.C.A. § 39-12-101 (2006).  Thus, in order to have committed attempted aggravated animal cruelty, the Defendant must have intended to kill or cause serious physical injury to Lucas and done so by conducting himself "in a depraved and sadistic manner" that tortured or maimed Lucas.  T.C.A. §§ 39-12-101 and 39-14-212(a) and (b)(2).

The evidence in this case, viewed in the light most favorable to the State, showed that the Defendant arrived home and found that his dog, Lucas, had chewed through several wires on his property.  Having dealt with Lucas's problem behavior for months, the Defendant, out of anger and frustration, resolved to file down Lucas's teeth.  The Defendant testified that he administered a pre-anaesthetic drug and a tranquilizer to Lucas as he prepared to file his teeth.  Neither of these would have completely immobilized Lucas or incapacitated him from feeling pain, but what the Defendant next did would: The Defendant straddled Lucas and struck his head at least ten times with an unidentified object, which fractured Lucas's zygomatic arch and caused orbital bleeding.  When Lucas stopped struggling, the Defendant wielded an unidentified instrument, perhaps an equine dental float, forced this into Lucas's mouth, and drug the instrument back and forth against Lucas's upper and lower teeth for approximately one minute.

Examination later revealed that the Defendant filed away thirty of Lucas's teeth to their roots, leaving many of these teeth fractured and shattered.  Lucas appeared to have swallowed several of the crowns of his teeth that the Defendant filed away.  The pre-anesthetic Lucas received from the Defendant would remove only some of his sensation of pain, and it would neither cause him to lose consciousness nor completely immobilize him.  Conversely, the tranquilizer the Defendant administered to Lucas would only immobilize

Lucas; it would not relieve pain or render him unconscious. Thus, based on the Defendant's own testimony, Lucas would have experienced pain while the Defendant filed his teeth and been aware of what the Defendant was doing. Thirteen root canals and six extractions were necessary to restore Lucas's mouth to a functioning level. In the weeks leading up to these restorative procedures and in the following recovery period, Lucas could eat only food that had been specially prepared for him.

After the Defendant stopped filing Lucas's teeth, he began to strike Lucas's head again until Lucas was completely motionless. The Defendant then rose from where he had been straddling Lucas, and he began angrily kicking Lucas "like he meant to hurt him, like he was mad at him." The Defendant also stomped on Lucas's chest several times.

When Maxwell, his neighbor, inquired as to whether Lucas was alive, the Defendant lifted Lucas, who was unconscious, up by his skin to chest-level and then carelessly tossed him back down to the ground. Maxwell then asked the Defendant why he had filed Lucas's teeth, and the Defendant referred to his actions as a form of "discipline," explaining that Lucas had chewed wires around his property. When he testified at his trial, he maintained this defense of his treatment of Lucas, defiantly stating that he simply attempted to replicate a procedure he had previously observed and that if he improperly did so, then "so be it."

We conclude that the record adequately supports the jury's finding that the Defendant attempted to commit aggravated cruelty to animals. The Defendant brutally knocked Lucas unconscious, filed his teeth, kicked Lucas several times while he remained unconscious, and then callously batted around Lucas's body. The evidence adduced at trial establishes that Lucas experienced pain both during and after the crude surgery the Defendant performed and that Lucas was only able to regain "functionality" as opposed to full restoration of his dental structure. Thus, the Defendant's surgery both tortured Lucas and left him maimed. The Defendant testified that he intended to file away Lucas's teeth, and from his testimony at trial we infer that he was not surprised by the extent of damage to Lucas's mouth his conduct caused. Thus, we conclude that the Defendant intended to severely physically injure Lucas and in fact did so.

Further, we note that the record need not show that the Defendant acted with the sole intent of injuring Lucas; the offense definition is broad enough to allow for the Defendant's additional objective of preventing further damage to his property. It is enough that the Defendant intended to file away Lucas's teeth to the root, causing severe physical injury, and that he did so through depraved and sadistic means that tortured or maimed Lucas.

Indeed, concerning the actus reus of the Defendant's conduct, we conclude that the Defendant filed away Lucas's teeth through depraved and sadistic means. In our view,

17

striking a dog multiple times in the head, forcefully filing away his teeth with only marginally effective anesthesia, and then angrily kicking the unconscious and bleeding dog is behavior "marked by corruption or evil" and of "excessive cruelty." *See* T.C.A. § 39-14-212(b)(1). Therefore, we conclude the record adequately supports the jury's finding that the Defendant intentionally carried out severe physical injury to Lucas through depraved and sadistic means that tortured and maimed Lucas.

Further, we note that the elements of attempted aggravated cruelty to animals are essentially identical to those of aggravated cruelty to animals, the offense for which the Defendant was indicted. To wit, aggravated cruelty to animals requires that an offender intentionally cause serious physical injury to a companion animal, with aggravated cruelty and with no justifiable purpose. T.C.A. § 39-14-212. As discussed above, attempted aggravated cruelty to animals requires that an offender act with aggravated cruelty and with no justifiable purpose, believing his conduct will cause severe physical injury on a companion animal with no further conduct on the offender's part. T.C.A. § 39-12-101. In this case, the record establishes not only that the Defendant acted with aggravated cruelty and with no justifiable purpose but also that his actions did in fact cause severe physical injury to Lucas. As such, the evidence is sufficient to support a finding of guilt as to aggravated cruelty to animals, for which the Defendant was originally indicted. The evidence is also, therefore, sufficient to support a finding of guilt as to attempted aggravated cruelty to animals. The Defendant is not entitled to relief on this issue.

## B. Sentencing

The Defendant contends the trial court erred when it denied him full probation. He argues that the evidence adduced at sentencing did not overcome "the statutory presumption of alternative sentencing." He argues his lack of a criminal history, his education, his history of peaceful relationships with animals, and the fact that he simply "did something totally out of line and out of character" establish his suitability for full probation under the principles of misdemeanor sentencing in the Sentencing Act. The State responds that the trial court considered the appropriate sentencing factors and that the "horrifying facts of this case" justify the Defendant's sentence.

Misdemeanor sentences must be specific and in accordance with the principles, purposes, and goals of the Criminal Sentencing Reform Act. T.C.A. §§ 40-35-104, -302 (2006); *State v. Palmer*, 902 S.W.2d 391, 393 (Tenn. 1995). We review misdemeanor sentencing de novo with a presumption of correctness. T.C.A. § 40-35-401(d) (2006). "[T]he presumption of correctness . . . is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing

18

Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2006).

The misdemeanor offender must be sentenced to an authorized determinant sentence with a percentage of that sentence designated for eligibility for rehabilitative programs. T.C.A. § 40-35-302. A convicted misdemeanant has no presumption of entitlement to a minimum sentence, and trial courts are afforded considerable latitude in misdemeanor sentencing. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999); *State v. Baker*, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997); *State v. Creasy*, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994).

At the conclusion of the sentencing hearing, the trial court noted that the jury's finding of guilt as to attempted aggravated animal cruelty implied that it credited the Defendant's testimony that he anesthetized Lucas before filing his teeth. The trial court expressed perplexity that the Defendant, an educated, middle-aged man with extensive experience with animals and little to no criminal history, "just did something totally out of line and out of character." The trial court said sentencing the Defendant was very difficult given the contrast between his sparse criminal history and the gravity of his conduct toward Lucas:

> [I]t is a very unusual incident. There was no proof, that I know of, of any other acts like this and, in fact, the defendant had worked for a veterinarian who testified that he was good with the animals. And the gravity of this instance, the gravity of this act is just bizarre compared to everything else I know which is why it makes it very difficult to sentence.
>
> The only thing I can figure . . . is that you really lost it one day. I don't know your normal demeanor but I can't imagine someone doing this to an animal who knows animals and ha[s] worked with a veterinarian and so forth. It was obviously–there is no way that this was just mistake or happenstance, you just went a little too far. This was certainly above and beyond that and the Jury so found you attempted to do that.

The trial court then noted that while the severity of Lucas's injuries were troubling, it was obligated to adhere to the sentencing guidelines:

> I considered all the facts and circumstances. I've considered the sentencing guidelines. A pretty wide range in discretion in misdemeanor cases but I can't just ignore the sentencing guidelines because of the act regarding the teeth of this animal.

The trial court then sentenced the Defendant to eleven months and twenty-nine days at 75%, with seventy-five days to be served in the Warren County Jail and the remainder on probation.

The Defendant contends the trial court erred when it ordered him to serve seventy-five days of his sentence in the Warren County jail. Our review of the record reveals, however, that the trial court undertook a careful examination of the Defendant's background as well as the details of his conduct in this case when it sentenced the Defendant. The trial court noted the Defendant's lack of a criminal history, his considerable education, his history of dealing with animals peacefully, and then it expressed its dismay over the Defendant's markedly divergent conduct in this case. The court explicitly said that, although it was taken aback by the striking violence of the Defendant's acts, it would constrain itself to the Sentencing Guidelines. With these considerations and limitations in mind, the trial court then ordered the Defendant to serve part of his sentence in jail. The trial court, therefore, considered the sentencing principles and all relevant facts and principles when it sentenced the Defendant. *Ashby*, 823 S.W.2d at 169. We, therefore, presume the trial court's sentence to be correct and conclude that it did not err when it sentenced the Defendant. *Id*. He is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the evidence is sufficient to support the Defendant's conviction for attempted cruelty to animals and that the trial court properly sentenced the Defendant. As such, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE